UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **GERALDINE BELTON** | **CASE NO. 6:21-CV-03650** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **NATIONSTAR MORTGAGE L L C** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## TRIAL OPINION

The Court held a bench trial commencing on November 6, 2023, and ending on November 7, 2023. On June 24, 2010, Plaintiff, Mrs. Geraldine Belton, who is 88 years old and suffers from the early onset of dementia, and her husband, now deceased and a Marine Veteran, executed a reverse mortgage note and mortgage in favor of Urban Financial Group.[1] Mortgage Assets Management, LLC ("MAM") holds the mortgage, which is secured by Plaintiffs' Property that is the subject of this lawsuit.

Mrs. Belton filed this lawsuit against Defendant, Nationstar Mortgage, LLC d/b/a Champion Mortgage ("Nationstar" also referred to as "Champion") because Nationstar/Champion refused to endorse a check issued by her insurer, USAA, for proceeds from Plaintiff's damage claim as a result of Hurricane Delta. USAA issued a check on January 27, 2021 for $47,759.91, jointly payable to Eldredge Belton (Plaintiff's deceased husband), Plaintiff, Geraldine Belton, and Nationstar/Champion.

Defendant's position is that Plaintiff was required to hire a Louisiana licensed contractor to perform the necessary repairs, therefore, it was not obligated to endorse and

---

[1] Exhibits D-11, D-12 and D-13.

release any of the insurance proceeds that would have allowed Plaintiff to repair the property or at the very least to mitigate the damage to the home.

Plaintiff's position is that Louisiana law does not require that she use a Louisiana licensed contractor to repair the property, or alternatively, Champion led her to believe that said requirement was waived, or that Nationstar did in fact waive the licensing requirement. Plaintiff asserts that Nationstar's refusal to endorse the insurance proceeds check caused further damage to her property.

## WITNESSES

*John Belton*

Mr. Belton, Plaintiff's son, testified that his mother had lived on the property for over 50 years and that his father, Plaintiff's husband, was deceased as of 2019. The subject home was a second home built and designed by the family in approximately 1990, after their previous home burned down. Mr. Belton testified that the home was the center for all family-related events and holiday gatherings.

Mr. Belton testified that he came home after Hurricane Delta and observed that the metal roof was partially torn off and damaged. In an attempt to protect the home, Mr. Belton and neighbors tarped the roof. After time passed, the tarps became shredded by wind and weather, therefore, he had to replace the tarps on two other occasions.

Mr. Belton observed rain pouring in the house. The family went on vacation in July 2021, and when they returned, he observed that the sunken part of the living room was filled with water from rain pouring in the house. This was not the first time he observed water coming in the house. The tarps were not preventing the rain from coming in because

the chimney was leaking, and he could not stop it from leaking. Mr. Belton purchased more expensive tarps to prevent the leaking.

Mr. Belton recorded the rain pouring in from the ceiling in September 2021 and December 2021. The videos showed that the roof was still exposed, and there were stains on the ceiling, around the bay window, the back of the house, around the chimney, and in the sewing room. He also observed bubbles in the latex paint, mold from the rain, water spots, and torn off siding.

Mr. Belton also took pictures as the mold progressed in his mother's house. He testified that the pictures represented water and mold spots in the sheetrock, damaged buckled flooring in the foyer and in a bedroom. He testified that these did not exist prior to Hurricane Delta, nor were they present 2-3 months post Hurricane Delta or when USAA inspected the home. He testified that his mother was having to watch her home deteriorate daily and how this caused her health to deteriorate.

Mr. Belton testified that USAA insured the property and that his oldest sister, Judy Belton handled the insurance process. Mr. Belton was aware that his mother had to file a lawsuit to get Nationstar/Champion to release the insurance proceeds. The roof was repaired in March 2022, after the proceeds were released in January 2022. Mr. Belton testified that prior to Hurricane Delta, the house did not have any water leaks and after the roof was replaced, there was no water leaking in the home.

Mr. Belton testified that FEMA was not in the area for assistance. Mr. Belton bought tarps from Harbor Freight and that if there was any other work that could have been done to prevent the leaks, he would had done so. Mr. Belton testified that he purchased the tarps

because his mother could not afford to make the repairs. Mr. Belton testified that he knew Jose Salgado who could make the necessary repairs to the roof.

Mr. Belton testified that Champion is still holding some of the insurance proceeds as of this date. The Court takes judicial notice that Champion is still holding over $7,000.00 of the insurance proceeds.

*Judy Belton*

Judy is Mrs. Belton's oldest daughter and her mother's power of attorney. Judy handled the claims' process for her mother concerning Hurricane Delta and was with her mother in the home when Hurricane Delta occurred. The day after the Hurricane, she observed missing siding and roof damage. She testified that her mother called USAA to initiate a claim in October.

USAA mailed Ms. Belton a check for $47,759.91 dated January 27, 2021.[2] Judy testified that the check was received a few days later in February 2021. Upon receipt of the check, Judy took her mother to the bank to deposit the check but was informed that Nationstar/Champion's endorsement was necessary. Judy testified that she immediately mailed the check to Nationstar/Champion but did not receive any communication from Nationstar/Champion as to receipt of the check or release of the funds. Judy called Champion in April 2021 to inquire about release of the funds.

---

[2] The check represented Mrs. Belton's property claim as follows: $76,391.41 less $19,911.50 for recoverable depreciation, less $8,720.00 for a total of $47,759.91, exhibit P-16.

Page 4 of 18

Between February and May of 2021, Mrs. Belton communicated directly with Champion. On April 27, 2021, Champion sent Mrs. Belton a letter requiring additional information and documentation in order to release the funds.

Nationstar/Champion returned the check to Mrs. Belton in April 2021, because it was missing Mr. Belton's endorsement. Mrs. Belton endorsed the back of the check and sent it back to Nationstar/Champion two (2) days later in April or May 2021. Sometime thereafter, Nationstar/Champion received the requested documentation and received insurance claim check on May 28, 2021.

Judy testified that in order to receive the approximately $19,000.00 of recoverable depreciation, the USAA Property Claim Settlement included a provision that repairs would need to be made by October 9, 2021. Therefore, because Champion did not release any funds until January 2023, Ms. Belton was prevented from recovering any of the $19,000.00 of depreciation.

During the April 2021 conversation between Judy and Nationstar/Champion, the issue of the licensed contractor came up and Judy immediately attempted to find a licensed contractor. Judy and her family were unsuccessful because every licensed contractor was working in the Lake Charles, Louisiana area where both Hurricanes Laura and Delta caused extensive damage. Judy informed Nationstar/Champion that she was unable to find a licensed contractor and asked Nationstar/Champion to assist. She testified that she informed Nationstar/Champion that if it could find a Louisiana licensed contractor, she would use them.

Judy informed Nationstar/Champion that she found an unlicensed contractor, Jose Salgado, who agreed to make the necessary repairs including repair of the roof. During a conversation with Nationstar/Champion, on or about April 20, 2021, Judy testified that a representative for Nationstar/Champion informed her that she could sign a waiver of the license requirement. Judy testified that the waiver was faxed to Nationstar/Champion in April 2021. Judy sent Nationstar/Champion all information it requested about Jose Salgado, the very next day. However, Nationstar/Champion then informed Judy that because Mr. Salgado was not a licensed contractor, it would not release the insurance proceeds. Judy testified that her mom was adamant about hiring Mr. Salgado because the family was unable to find a licensed contractor.

In June 2021, Judy contacted Nationstar/Champion about the release of funds because Mr. Salgado was ready to repair the roof, however, Judy testified that the Nationstar/Champion representative advised her that she or Mrs. Belton could get on the roof and fix it themselves. Judy reviewed Champion's call logs which reflects that Champion advised Mrs. Belton or a handyman to fix the roof.

Judy first observed water intrusion from rain in the home in July 2021. In September 2021, she again observed water intrusion from rain. After this rain event, the family discussed hiring an attorney to compel Nationstar/Champion to release the insurance proceeds.

Judy testified that after the hurricane, the family assisted Mrs. Belton in tarping the damaged parts of the roof and no water leaked in the home from October 9, 2020, and February 2021.

Champion released $40,000.00 of the insurance proceeds to Mrs. Belton in January 2022, after the lawsuit was filed. Judy testified that Mr. Salgado made repairs to the roof and eight (8) windows in March 2022 after the funds were released, and there has been no further water intrusion in the home. She also testified that Nationstar/Champion has not communicated anything to Ms. Belton as to the remaining $7,759.91 they continue to hold, nor has Nationstar/Champion inspected any repairs that have been made.

Judy testified that there is still damage to ceiling, floors, foyer and halls as well as mold. Judy testified that her mom has suffered loss for having to file a lawsuit, something she would not normally do. She also testified that her mother would not be able to recover the $19,000 in depreciation because the roof could not be repaired within the time limits set forth in the policy. Judy testified she obtained estimates to repair the floors and her mom had to pay a $300 filing fee, and $585.17 for mediation and other costs to compel Nationstar/Champion to release the insurance proceeds.

Judy testified that Mrs. Belton has a medical condition that affects her health related to memory loss, which she claims was augmented since the Hurricane due to the stress caused by Nationstar/Champion's failure to release the insurance proceeds. Additionally, she testified that Mrs. Belton suffers from dementia, and since the home was damaged, she has become totally withdrawn. Ms. Belton, who is 88 years old, was diagnosed in 2023 with dementia. Judy observed her mother crying because of the water in her house. Judy testified that her mother is totally lost when away from the house and she is concerned that if her mom has to leave the home for repairs, she will not survive.

Judy testified that her mom's dementia started around September 2021, and that prior to that time she would have been willing to leave the home for the repairs, but after she experienced the deterioration of her home, due to her mental state, her mom would not be able to leave.

Judy testified that she paid Mr. Salgado $22,000 to repair the roof and the windows, and the remaining $18,000 is currently in her mother's bank account. However, no further repairs have been made to the interior of the home. She has called a contractor but that contractor is busy with other homes and she has not contracted with anyone to make any further repairs. She further testified that she did not believe that the remaining $18,000 would cover the damages needed to repair the home.

*Alexis Mallet, Jr.*

Mr. Mallet, retained by Nationstar/Champion, is the president and a construction consultant for First General Services of the South. He inspects properties, writes reports, conducts mold remediation analysis, oversees construction projects, and employees. He has testified as an expert in general construction, estimating, building and science, construction defects and failures, mold remediation, and termite damage.

Mr. Mallet inspected Mrs. Belton's home on August 17, 2023, after which he prepared a report of his findings. Mr. Mallet received three different estimates from Jose Salgado, which he reviewed and discussed in his report.

Mr. Mallet testified that he observed some replacement repair on the roof's rear lower slope of the house and upper rear section of the roof and flashing for the fireplace. He also noted repairs to some windows and window casings. Mr. Mallet testified that there

was no repair work performed on the interior of the home. Mr. Mallet testified that during his inspection, he observed some windows and doors had deteriorated due to age, which he opined pre-existed Hurricane Delta. Mr. Mallet observed caulking around the windows to address the deteriorated sealant; therefore, he opined that someone knew that the windows were allowing moisture to enter the home. Mr. Mallet also noted one broken window with only a partial windowpane and cardboard covering the window, which also allowed moisture to enter the home. Mr. Mallet also testified, supported by photographs, as to other parts of the house that were deteriorated, but not damaged by Hurricane Delta.

When Mr. Mallet inspected the home, he observed microbial growth in a few areas of the house, however, he was not asked to conduct any mold testing. He also observed the effects of previous water intrusion in the home. Mr. Mallet faulted Mrs. Belton for the spread of mildew for not installing temporary coverings on her home, specifically around the chimney and windows in addition to the other deteriorated windows and doors.

Mr. Mallet testified that most of the damage to the dry wall, ceiling, and flooring was caused by long-term exposure to moisture. Mr. Mallet reviewed Mr. Salgado's estimates, which noted damage related to rotted window frames, soffit and facia and concluded that this damage pre-existed Hurricane Delta.

Mr. Mallet reviewed the estimate prepared by USAA presented at the mediation, which he noted did not include, indicate, and/or refer to any mold in the home. Mr. Mallet also reviewed an April 8, 2022, estimate prepared by Mr. Salgado to repair Plaintiff's home for a total amount of $272,000.00. Mr. Mallet opined that this estimate does not resemble hurricane related damages to the home. Mr. Mallet noted Mr. Salgado's first report did not

include removing and installing sheetrock from the ceilings in each room and new sheetrock in laundry room. He concluded that these repairs were a betterment or remodeling. Mr. Mallet also reviewed Restoration Pros' estimate for mold repairs for a total amount of $115,259.89 and $26,774.26 to pack and remove to make the repairs. Mr. Mallet disagreed with certain items included in the Restoration Pros' estimate and opined that the mold was caused by the state of disrepair that existed before Hurricane Delta made landfall.

Mr. Mallet opined that the purpose of Louisiana's law that requires a contractor to be licensed, was to protect the public.

Mr. Mallet testified that he observed the various water stains throughout the interior of the home. In addition, he observed areas on the interior of the home that had repair work pre-existing Hurricane Delta, which indicated that the home had prior water leaks that allowed moisture in the home. Mr. Mallet testified that some of the interior damage, specifically near the chimney was caused by Hurricane Delta.[3]

Mr. Mallet testified that USAA's damage adjustment included replacing the roof and the flashing around the chimney, and that there was more sheetrock damage than USAA's damage adjusted reflected.

Mr. Mallet estimated that if Champion was found to be in breach of its duties to Mrs. Belton by failing to release the USAA insurance proceeds, the home suffered additional damage in the amount of $32,274.95. Mr. Mallet opined that Mrs. Belton would

---

[3] USAA's damage adjustment included replacing the roof and the flashing around the chimney.

not need to move out of the house in order for the home to be repaired. He explained that there were areas of the home that had not been damaged that could be cordoned off, and air machines could be used to allow certain areas of the home to be repaired.

The Court finds that Mr. Mallet is a credible witness and that his calculations were reasonable.

*Carine Fol*

Ms. Fol is the Senior Vice President of Mortgage Assets Management, LLC. ("MAM") for Nationstar and testified as the corporate representative of MAM, the holder of Mrs. Belton's reverse-mortgage. Mrs. Belton testified that Nationstar/Champion considered Fannie Mae Guidelines and state law requirements in requiring Mrs. Belton to hire a licensed contractor before it would release the insurance proceeds.

Ms. Fol testified that Nationstar/Champion decided to release the majority of the funds ($40,000.00) to Mrs. Belton four months after Mrs. Belton filed suit, despite the fact that she did not have a licensed contractor. Ms. Fol testified that because Nationstar/Champion has a vested interest in the property, it has the right to control how the money (insurance proceeds) is spent.

Ms. Fol explained several letters, dated April 16, 2021, April 27, 201, May 21, 2021, July 21, 2021, which expressly stated that Nationstar/Champion was assisting Mrs. Belton to obtain her insurance claim proceeds from the insurer and also listed requirements and/or documents she needed to provide. The July 21, 2021, letter also discussed Champion's request that Mrs. Belton provide information on a licensed contractor.

Ms. Fol reiterated that it released the proceeds to Mrs. Belton, despite its position that Fannie Mae guidelines require that she hire a licensed contractor.

Ms. Fol testified as to Nationstar/Champion's call logs ("system notes"). She explained that the system notes reflect the nature of the calls between Nationstar/Champion and Mrs. Belton, and that they are accurate and detailed. The system notes indicate that Nationstar/Champion was informed of the property damage April 19, 2021, and received the USAA insurance check on April 26, 2021. However, the check was returned to Mrs. Belton for proper endorsement. It took approximately three months for Nationstar/Champion to receive the fully endorsed check due to needing the proper endorsement and documents concerning the death of Mrs. Belton's husband.

On or about April 22, 2021,[4] the system notes indicate that Mrs. Belton's daughter, Judy, made a call to Nationstar/Champion to verify and inquire about Mrs. Belton writing a letter at Nationstar/Champion's insistence, and her being allowed to complete the repairs to her home without complying with the guidelines.[5] The Court finds that this call note clearly indicates that Nationstar/Champion had instructed and/or advised Mrs. Belton to draft a letter, represented as a waiver, that would permit her to make the repairs outside of Champion's guidelines; specifically, that she would be able to hire and use an unlicensed contractor. The Court finds that this note in the call log indicates that Nationstar/Champion had communicated to Mrs. Belton that it would waive the contractor licensing requirement.[6]

---

[4] D-10, Bates 41.
[5] D-10.
[6] Page 5 of the call log dated 4/22/2021 reads as follows:

Ms. Fol testified that Nationstar/Champion did not permit Mrs. Belton to use an unlicensed contractor and that it informed her numerous times that she could not use an unlicensed contractor. The system notes also indicate numerous communications between Mrs. Belton, her daughter, Judy, and Nationstar/Champion about several requests for a more detailed bid estimate, and other documents including a W-9 from the contractor and the contractor's license certification. Nationstar/Champion refused to release the funds because Mrs. Belton could not hire a licensed contractor. As some point, Mrs. Belton or Judy informed Nationstar/Champion that Louisiana does not require her to hire a licensed contractor; Champion disagreed and stated that a licensed contractor was required for contracts over $7,500. Again, Champion refused to release the insurance proceeds.

Ms. Fol testified that MAM did not release the remaining insurance proceeds because the repairs were not completed. Ms. Fol explained that the system call notes are just summaries of conversations, but do not record the entire conversations, including Mrs. Belton and/or her daughter's repeated complaints that they were unable to hire a licensed contract because they were all working in the Lake Charles area, and/or that rain was pouring in the house.

## LAW AND ANALYSIS

Mrs. Belton has asserted a negligence claim against Champion/Nationstar for failing to release the insurance proceeds that would have allowed her to make necessary repairs to her home after Hurricane Delta. Plaintiff alleges that Champion's negligent conduct

---

Ms. Belton called in to verify what she needed to write in the letter of repair responsibility.
Solution: I advised her to write that the borrower will complete the repairs without complying with our guidelines.

caused her further damage to her home, as well as costs and expenses, and mental pain and suffering.

Under Louisiana law, courts apply the same duty/risk analysis to negligence claims. *Farrell v. Circle K. Stores, Inc., 359 So. 3d 467, 473 (La. 2023)*. Whether a claim arises in negligence under La. Civ. Code art. 2315, the traditional duty/risk analysis is the same. A plaintiff asserting a negligence claim must prove: (1) The defendant had a duty to conform [their] conduct to a specific standard (the duty element); (2) The defendant's conduct failed to conform to the appropriate standard (the breach element); (3) The defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) The defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of duty element); and, (5) proof of actual damages (the damages element). La. Civ. Code art. 2315 states the following in pertinent part: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

The Plaintiff seeking damages in a civil action must prove each element of his claim by a preponderance of the evidence. *Erwin v. State Farm Mut. Auto. Ins. Co. , 34,127 (La. App. 2 Cir. 11/1/00), 771 So. 2d 229, writ denied , 00-3285 (La. 2/2/01), 784 So. 2d 6. See also Willis v. Manning , 37,259 (La. App. 2 Cir. 6/25/03), 850 So. 2d 983*. Proof by preponderance of the evidence means that the evidence, when taken as a whole, shows that the fact to be proven is more probable than not. *Erwin v. State Farm Mut. Auto. Ins. Co. , supra*.

## **FINDINGS OF FACT**

The Court finds that Mrs. Belton has proved by a preponderance of the evidence that Champion/Nationstar was negligent in failing to release the insurance proceeds to Mrs. Belton and that such negligence caused further damage to her home. The Court also finds that Mrs. Belton has proved by a preponderance of the evidence that she suffered mental anguish as a result of Champion/Nationstar's negligence and had to pay additional costs by filing this lawsuit to compel Champion/Nationstar to release the insurance proceeds.

The Court does not agree with Champion/Nationstar that Louisiana Revised Statute 37:2160 requires that a homeowner must hire a licensed contractor to make repairs to their home. The purpose of this statute is to regulate contractors in the state of Louisiana, not homeowners. The Court notes that the penalty provisions in Louisiana Revised Statute 37:2164 apply to contractors who fail to comply with relevant Statutes. As stated in Louisiana Revised Statute 37:2150, "the purpose of the legislature in enacting this Chapter is the protection of the health, safety, and general welfare of all persons dealing with persons engaged in the contracting vocation, and the affording of such persons of an effective and practical protection against the incompetent, inexperienced, unlawful, and fraudulent acts of contractors with whom they contract." Nothing in this Chapter indicates that the purpose is to protect a mortgage company. Further, nothing in this statute requires a homeowner, including Mrs. Belton to only hire licensed contractors. To the contrary, Defendants ignore that people can make repairs on their own or with the assistance of people who are unlicensed.

The Court further finds that Nationstar waived any requirement concerning a licensed contractor, even if one existed. First, Mrs. Belton presented evidence that a Nationstar/Champion representative instructed Mrs. Belton as to the language necessary to draft a waiver that would allow her to hire a contractor outside any requirements Nationstar/Champion believed that it had, and second, Nationstar released the funds, albeit late, without requiring Mrs. Belton to hire a Louisiana licensed contractor to repair her home.

Nationstar/Champion argues that it owns the insurance proceeds as loss payee since the insured homeowner obtained the policy for the lender's benefit, and thus it has the right to control and dictate how the insurance proceeds are spent. Here, Mrs. Belton, as the deceased widow of Mr. Eldridge Belton and homeowner, is the named insured on the USAA policy.[7] The lender, Nationstar/Champion has presented no evidence to this Court that it was a named insured, or additional insured on the USAA policy of insurance. At most, the mortgage agreement could be read that the mortgage holder is to be an additional insured. This does not equate to sole ownership of all insurance proceeds.

The Court finds that a significant portion of the damage in the home as evidenced by testimony, video, and photographs was preexisting the Hurricane and therefore not caused by Nationstar/Champion's refusal to release the insurance proceeds. Additionally, the Court finds that the damage claim for mold was preexisting due to the deteriorating

---

[7] Property Settlement, Doc. 80-6.

condition of the home and not caused by Hurricane Delta and/or Nationstar/Champion's refusal to release the insurance proceeds.

The Court finds that Mr. Mallet's (Nationstar/Champion's witness) testimony and calculations as to any damage that may have been caused by Nationstar/Champion's refusal was credible and proof of Mrs. Belton's damage. Thus, the Court finds that the damage for Mrs. Belton's negligence claim is $32,274.95.

The Court finds that Mrs. Belton is not entitled to damages for lost depreciation because there was no evidence submitted at trial to show that Mrs. Belton would have made the necessary repairs. For example, as of the date of the trial, Mrs. Belton kept the remaining insurance proceeds in her bank account; additionally, the deteriorating condition of the home that preexisted the Hurricane, the absence of any significant repairs being made to the home, and the absence of a contractor's bid to make those repairs indicate to this Court that Mrs. Belton would not have made the necessary repairs that would entitle her to the recoverable depreciation.

The Court also finds that Mrs. Belton has proven that she suffered mental anguish as a result of Nationstar/Champion refusing to release the insurance, as well as Plaintiff's costs for being forced to file this lawsuit to compel Nationstar/Champion to release the insurance proceeds.

## CONCLUSION

Finding that Mrs. Belton has proved her negligence claim, the Court will enter judgment in favor of Plaintiff, Geraldine Belton, and against Defendant Nationstar Mortgage, LLC/Champion for damages in the amounts as follows:

| | |
|---|---|
| Negligence claim | $32,274.95 |
| Cost and mediation expenses | $   876.00 |
| Mental anguish | $10,000.00 |
| **TOTAL damages** | **$43,150.95** |

The Court will issue a separate judgment as to these amounts to include prejudgment and post-judgment interest. Nationstar will also be ordered to release the remaining insurance proceeds that it has withheld from Mrs. Belton.

**THUS DONE AND SIGNED** in Chambers this 29th day of November, 2023.

_____
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**